# STANLEY *v.* SCHWALBY.

ERROR TO THE COURT OF CIVIL APPEALS FOR THE FOURTH SUPREME JUDICIAL DISTRICT OF TEXAS.

No. 653. Submitted January 10, 1896. — Decided March 23, 1896.

Neither the Secretary of War, nor the Attorney General, nor any subordinate of either, is authorized to waive the exemption of the United States from judicial process, or to submit the United States, or their property, to the jurisdiction of the court in a suit brought against their officers.

In an action of trespass to try title, under the statutes of Texas, brought by one claiming title in an undivided third part of a parcel of land, and possession of the whole, against officers of the United States, occupying the

land as a military station, and setting up title in the United States, a judgment that the plaintiff recover the title in the third part, and possession of the whole jointly with the defendants, is a judgment against the United States and against their property.

The United States are not liable to judgment for costs.

In order to charge a purchaser with notice of a prior unrecorded conveyance of land, he or his agent in the purchase must either have knowledge of the conveyance, or, at least, of such circumstances as would, by the exercise of ordinary diligence and judgment, lead to that knowledge; vague rumor or suspicion is not sufficient; and notice of a sale does not imply knowledge of an unrecorded conveyance.

A conveyance of land by a city to the United States, in consideration of the establishment of military headquarters thereon, to the benefit of the city, is for valuable consideration.

A purchaser of land, for valuable consideration, and without notice of a prior deed, takes a good title, although his grantor had notice of that deed.

Even where, as in Texas, a purchaser taking a quitclaim deed is held to be affected with notice of all defects in the title, a purchaser from him by deed of warranty is not so affected.

The United States, by warranty deed duly recorded, purchased land from a city for a military station, in consideration of the benefits to enure to the city from the establishment of the station there. The attorney employed by the United States to examine the title testified that the city acquired the land by quitclaim deed, describing it as "known as the McMillan lot;" that he had information of a sale to McMillan, but satisfied himself that he had not paid the purchase money; and searched the records, and ascertained that no deed to him was recorded; and advised the United States that the title was good. There was no evidence that the attorney had any other means of ascertaining whether a deed had been made to McMillan. *Held*, that the evidence was insufficient in law to warrant the conclusion that the United States took no title as against an unrecorded conveyance to McMillan.

Where the judgment of the highest court of a State against the validity of an authority set up under the United States necessarily involves the decision of a question of law, it is reviewable by this court on writ of error, whether that question depends upon the Constitution, laws or treaties of the United States, or upon the local law, or upon principles of general jurisprudence.

An action to recover the title and possession of land against officers of the United States setting up title in the United States, and defended by the District Attorney of the United States, was dismissed by the highest court of the State as against the United States; but judgment was rendered against the officers, upon the ground that they could not avail themselves of the statute of limitations. This court, on writ of error, reversed that judgment, and remanded the case for further proceedings. The highest court of the State thereupon held that the United States were a party to

the action, and decided, upon evidence insufficient in law, that the United States had no valid title, because they took with notice of a prior conveyance; and gave judgment against the officers for title and possession, and against the United States for costs. This court, upon a second writ of error, reverses the judgment, and remands the case with instructions to dismiss the action against the United States, and to enter judgment for the individual defendants, with costs.

THIS was an action of trespass to try title, brought in the district court of Bexar county in the State of Texas, by Mary U: Schwalby, joining her husband, J. A. Schwalby, against David S. Stanley, William R. Gibson, Samuel T. Cushing and Joseph C. Bailey, to recover a parcel of land in the city of San Antonio.

The original petition was filed February 23, 1889; and, as amended by leave of court December 2, 1889, alleged that Mrs. Schwalby was seized and possessed in fee simple of an undivided third part of the land, and she and her husband were entitled to the possession of the whole, and that the defendants, without any right or title, ousted them from the possession thereof; and prayed "judgment for the recovery of the title to one third of said premises, and possession of the whole thereof, for costs of said suit, and for general relief."

The individual defendants, and "the United States, by their attorney, Andrew J. Evans, acting by and through instructions from the Attorney General 'of the United States, here exhibited to the court," (but not at that time made part of the record,) filed an amended answer, in which they pleaded not guilty; and set up, among other defences, that the title to the land was in the United States, and the individual defendants had and claimed no title therein, but were lawfully in possession thereof as officers and agents of the United States; and specially pleaded that the city of San Antonio in 1875 purchased the land, and on June 16, 1875, conveyed it to the United States, with no notice of the plaintiffs' claim, and the United States were innocent purchasers for valuable consideration; and that from June 16, 1875, to the bringing of this action the United States had been in the actual, peaceable and adverse possession of the land, continuously enjoying and improving it, no taxes being due thereon — under deed duly re-

corded, and "under title, and color of title, from and under the sovereignty of the soil, down to the defendant, the United States, duly registered" — and therefore pleaded the statutes of limitations of the State of Texas of three, five and ten years; and also that the United States had made permanent and valuable improvements on the land.

The plaintiffs, by supplemental petition, excepted to the answer, so far as it was filed in behalf of the United States, upon the ground that the United States were not a party defendant, and that neither the District Attorney nor the Attorney General of the United States had authority to submit for adjudication, in the courts of the State of Texas, the rights of the United States of America; as well as upon the ground that the pleas of the statutes of limitations of the State of Texas constituted no defence to the action, because the United States were neither bound by nor protected by those statutes, and because the plaintiffs could not, in any court, bring suit against the United States; and to the pleas of the statutes of limitations replied that on January 18, 1871, and long before their adverse possession commenced, the plaintiff, Mary U. Schwalby, was lawfully married to her co-plaintiff, and had ever since continued to be a married woman.

Joseph Spence, Jr., intervened by leave of court, and filed a petition, similar to the principal one, likewise claiming an undivided third part of the land.

The parties submitted the case to the decision of the court without a jury. At the trial the following facts were proved or admitted:

The common source of title, through whom all parties, the plaintiffs, the intervenor, and the United States, claimed this land, was Antony M. Dignowity.

On September 13, 1858, he executed to Amanda J. Dignowity, his wife, a general power of attorney to sell and convey his real estate; and by virtue thereof she, on May 9, 1860, executed a warranty deed to Duncan B. McMillan of this parcel, reciting the payment by him of a consideration of $100. This deed was acknowledged on the same day before William H. Cleveland, notary public; but was not recorded until Sep-

tember 30, 1889. McMillan died in Louisiana in February, 1865, intestate, a widower, leaving three children: Mary, the female plaintiff, who was born September 11, 1848, was married to J. A. Schwalby January 18, 1871, and was still his wife when this action was tried; Sarah, who was born August 3, 1854, married to one Neely February 14, 1875, and died August 17, 1878, leaving two children, who were still living; and Duncan W. McMillan, born November 2, 1850, who by deed, dated and acknowledged March 26, 1889, and recorded March 29, 1889, conveyed his interest in this land to the intervenor, Joseph Spence, Jr.

Dignowity died in April, 1875, and by his will, admitted to probate April 22, 1875, devised and bequeathed all his property to his wife, and made her independent executrix, with full power of sale and disposition of all his property, and requiring of her no bond or inventory. By deed of quitclaim and release, dated May 1, 1875, and recorded June 1, 1875, the widow, in her own right, and as independent executrix, for the consideration of $1500, conveyed to the city of San Antonio four lots of land, one of which was that now in question, described as "lot number one, in block number two, known as the McMillan lot," with special warranty against all persons claiming by, under or through Dignowity or his estate. By warranty deed in the statutory form, dated June 16, 1875, and recorded October 21, 1875, the city of San Antonio conveyed the four lots to the government of the United States of America for military purposes, "in consideration of one dollar paid to the said city of San Antonio by the said government, the receipt whereof is hereby acknowledged, and for divers and other good and sufficient considerations thereunto moving."

The defendant Stanley, being called as a witness for the plaintiffs, testified as follows: "Myself and the other defendants were in possession of the lot when this suit was brought. I am a brigadier general in the United States Army; my codefendants are officers in the United States Army. We took, held and hold such possession as such officers of the United States Army. The government of the United States took

actual possession of the land in controversy in the year 1882. The land sued for is part of the military reservation of the United States of America at San Antonio. We hold possession under the United States of America. According to my understanding, the United States first took possession of this lot in the year 1875 or 1876; it was then open prairie. We do not claim title to the land in our own right, but hold it for the United States. The United States have made the following improvements upon the lot in controversy before the institution of this suit" (stating them). " These improvements were made since the year 1881; before that, the lot was open prairie. I never heard of a claim against this land until the commencement of this suit."

Mrs. Dignowity, in a deposition taken by the plaintiffs July 23, 1889, before William H. Houston, notary public, but introduced in evidence by the defendants, after being shown her deed to the city of San Antonio, dated May 1, 1875, testified as follows: " Lot 1 in block 2, named in that deed, was called by me the McMillan lot, because it was the habit of my husband during his lifetime, whenever he sold a city lot, to mark the name of the purchaser in pencil on the map, and, when the lot was paid for, to write the name in ink. I presume I found this lot marked in the name of McMillan in pencil, and therefore called it the McMillan lot. This is the only explanation I am now able to give." " I must have known in some way that the lot had been sold and a payment made on it; and I know of no other way I should have known it, except as stated above." " I have no recollection of ever making a deed to Duncan B. McMillan of lot 1 in block 2, though I may have done so. If such a deed was made by me twenty-nine years ago, I do not see why it was not recorded, unless perhaps the full purchase money had not been paid." " I do not know who was in possession of the lot from 1860 until my husband's death in 1875, but believe it was unoccupied. I do not know that it was claimed by any one but him. I paid the taxes on it during that time. I never took actual possession of the lot, but continued to pay the taxes until it was sold to the city. I never had said lot in

actual possession, and never had a tenant on it." " Neither Duncan B. McMillan, nor any one for him, nor any of his heirs, ever claimed an interest in the lot in suit in this case, from 1860 to 1875, to my knowledge. When I sold the lot in controversy to the city of San Antonio, I acted in good faith. I believed for some reason that Duncan B. McMillan had some claim on the lot, or I should not have specially quit-claimed it to the city."

In a second deposition, taken by the defendants December 31, 1889, she testified: " I am in my seventieth year, and reside in San Antonio." " I have seen the original of the deed from me to Duncan B. McMillan, dated May 9, 1860. I was shown the deed by Captain William Houston. I have never seen it but that one time, since it was executed by me, until to-day. I carefully examined it, and it is a genuine deed. I don't know why said deed was never recorded until a few months ago. I don't know whether I ever delivered possession of the lot in controversy to Duncan B. McMillan or his agent for him formally, or not. I paid taxes on the land until it was sold subsequently. I don't remember of receiving but fifty dollars on the transaction, and think that was paid before the date of the deed. I don't recollect anything more than that I was paid fifty dollars on the trade, and I executed the deed, and acknowledged it before Mr. Cleveland, and left it with him." " I have not seen Duncan B. McMillan since 1860. He was then on his way home to Louisiana." " I do remember W. H. Cleveland. He was a lawyer in good standing about the year 1860. He did at times attend to business both for myself and husband. I have owned and sold considerable real property in Texas, and still own property and have experience in dealing in lands and city lots." " The deed from me to McMillan recites a consideration of $100; but I do not recollect of receiving but fifty. I received fifty dollars, as before stated; my husband never received a cent. I don't know anything about what other persons may have received. I know nothing of any note. I don't know anything about the money having been paid to Cleveland; if it was, I don't know anything about it."

George C. Altgelt, being called as a witness for the defendants, testified: "I am plaintiffs' attorney. I do not know Mrs. Mary U. Schwalby personally. I received the deed to Duncan B. McMillan from Amanda J. Dignowity, attorney in fact for Anthony M. Dignowity, by mail. It was sent to me by Joseph Spence, Jr., who is a lawyer and land agent of San Angelo, Tom Green county, Texas. I never saw Mrs. Schwalby."

James H. French, a witness for the defendants, testified: "I was mayor of the city of San Antonio in 1875, at the time the city purchased the property from Mrs. Dignowity. The city paid the consideration, $——, to Mrs. Dignowity, in 1877. The government buildings, the officers' quarters, were placed upon the Dignowity property. The city had the title examined by A. J. Evans. When the city purchased from Mrs. Dignowity and paid the money, the city had notice of this claim; that is, the claim of D. B. McMillan. We had this notice from Mrs. A. J. Dignowity. Mrs. Dignowity refused to give a warranty deed to the lot in controversy. I, as mayor of the city, had notice of the McMillan claim at the time the city purchased. There was no consideration paid direct from the government to the city for the property. It was a donation from the city to the government. The city never received any consideration from the government for the conveyance; but, by reason of the establishment of the military headquarters here, the city has received a thousand-fold benefit on the consideration paid by her to Mrs. Dignowity."

Andrew J. Evans, being called by the defendants, testified: "I, as United States District Attorney for the Western District of Texas, in 1875, made an examination of the title to the lot in controversy, and traced the title back to the case of *Lewis* v. *City of San Antonio.* I examined the records of deeds for Bexar county, Texas, and did not find any deed of record from Dignowity, and after I had made the examination I believed the title was good. I so advised the department at Washington, and upon my advice the government took the deed from the city in good faith."

Upon cross-examination, Evans testified: "I made the ex-

amination of the title as United States Attorney, and advised that the title was good. I saw the deed from Mrs. Dignowity as executrix, etc., to the city of San Antonio, read it, and had notice of all its recitals. I had information of the sale to Duncan B. McMillan, but I satisfied myself that he had never paid the purchase money." He was then asked, "When you read the deed from Mrs. Dignowity to the city of San Antonio, and saw there the lot in dispute was quitclaimed, and described as being 'known as the McMillan lot,' did not these facts create in your mind a suspicion that the title to this lot was not all right?" To this question the witness answered, "They did not."

There was no evidence, beyond that above stated, bearing upon the question whether the deed from Dignowity to McMillan was ever delivered; or upon the question whether the United States took the deed from the city of San Antonio with notice of a previous conveyance to McMillan.

The district court of Bexar county sustained the plaintiffs' exceptions to the pleas of the statutes of limitations, and ordered those pleas to be struck out; overruled the other exceptions of the plaintiffs; and gave judgment for the plaintiffs and the intervenor against the individual defendants and the United States for two thirds of the title to the land, and for possession jointly with the defendants of the whole, and for costs, and allowed to the United States the value of their improvements. On March 24, 1890, the United States and the other defendants appealed to the Supreme Court of the State of Texas, which, on March 4, 1892, ordered the judgment to be set aside and the action dismissed as against the United States, and affirmed the judgment as against the individual defendants. *Stanley* v. *Schwalby*, 85 Texas, 348. Upon a writ of error sued out by the United States and the other defendants, the judgment of the Supreme Court of Texas was reversed by this court, at October term, 1892, and the case remanded for further proceedings not inconsistent with its opinion, reported 147 U. S. 508. The Supreme Court of the State thereupon vacated its own judgment, reversed the judgment of the district court, and re-

manded the case to that court for such further proceedings.

In that court, leave to file an amended answer was then requested by the individual defendants, with whom, as the record stated, "come also the United States of America, by their attorney, Andrew J. Evans, who is United States Attorney for the Western District of Texas, duly appointed and commissioned as such, and who so appears for the said United States of America by direction of the Attorney General of the United States of America;" and who, as evidence of such direction, exhibited and filed a letter dated April 18, 1889, from the Secretary of War to the Attorney General, relating to this suit, and requesting that "the proper United States Attorney be requested to appear and defend the interests of the United States in this matter;" and a letter dated April 20, 1889, from the Attorney General, enclosing the letter of the Secretary of War, and "in compliance with his request" instructing the District Attorney "to appear and defend the interests of the United States involved therein."

Leave being granted, the United States, by the District Attorney, "by direction of the Attorney General, as heretofore exhibited to the court," together with the individual defendants, filed two pleas in bar: 1st, that this was an action, nominally against the individual defendants, "but in fact against the United States of America, a sovereign corporation not liable to suit in this court or any other, in the absence of an act of Congress;" 2d, that the action was against the property of the United States; and, in connection with each of these pleas, alleged that the individual defendants were officers in the military service of the United States, in possession as such of this land, under and by direction of the President of the United States of America, the Commander in Chief of the Army and Navy of the United States, and not of their own volition, will or wish, and that neither of them ever pretended to hold or have possession, or right of possession, or title, or color of title, of the land, as individuals, and that this suit was but a palpable device to maintain an action at law against the United States and their

property, and should not be further maintained; and also pleaded not guilty; and that the United States had held adverse possession in good faith, under a warranty deed made to them in 1875 by the city of San Antonio, and without knowledge or suspicion of any adverse title; and that the United States were innocent purchasers of the land for a valuable consideration, without notice of the plaintiffs' unrecorded claim; and set up the statutes of limitations, and a claim for improvements, as in their former answer.

The case was again tried by the district court, without a jury, and the same evidence introduced as at the first trial. The court overruled the first and second pleas in bar; and adjudged that Spence, the intervenor, take nothing by his petition; that the plaintiffs recover from the individual defendants one undivided third part of the lot in question, and the sum of $126.66 for their use and occupation of that part, and costs, and be put in joint possession with the defendants; and that the United States be allowed the sum of $333.33 for improvements.

Thereupon, as the record stated, "all parties, to wit, the plaintiff, the intervenor, the defendants, and the United States of America, in open court excepted to the judgment of the court, and gave due notice of appeal." And a report or statement of the case, called in the Texas practice " a statement of facts, or agreed statement of the pleadings and proof," (the material parts of which are given above,) was made up by the parties and certified by the judge. Texas Rev. Stat. of 1879, §§ 1377, 1414; Stat. April 13, 1892, c. 15, § 24.

Upon a writ of error sued out by the United States, and an assignment of errors by the defendants, and upon cross assignments of errors by the plaintiffs and by the intervenor, the case was taken to the Court of Civil Appeals for the fourth supreme judicial district of the State of Texas, which affirmed the judgment, except as to the allowance for improvements; and thereupon, " proceeding to render such judgment as should have been rendered by the court below," adjudged that the plaintiffs recover of the individual defendants one undivided third part of the land, (describing it,) and the sum of $126.66 for the use and

occupation of that part, with interest thereon from the date of the judgment below, and costs, and " have their writ of possession against said defendants and all other persons who have entered said premises since the filing of this suit on the 23d day of February, 1889, placing them in joint possession with the defendants ; " that Spence, the intervenor, take nothing by his suit ; and " that the plaintiff in error, the United States of America, who voluntarily made itself a party in the court below, take nothing by its plea, and pay all costs of this court and of the court below." The opinions on rendering that judgment, and on denying a motion for a rehearing, are reported, under the name of *United States* v. *Schwalby*, in 8 Texas Civ. App. 679, 685.

The Supreme Court of the State of Texas denied a petition of the United States for a writ of error from that court to the Court of Civil Appeals. The Chief Justice of the Court of Civil Appeals refused to allow to the United States a writ of error to bring up the case to this court. The present writ of error was thereupon sued out by the individual defendants and the United States, and was allowed by a justice of this court.

*Mr. Solicitor General* for the United States, plaintiffs in error, submitted on a printed argument.

*Mr. A. H. Garland* and *Mr. R. C. Garland,* for defendants in error, submitted on the record.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

This action was brought in a district court of the State of Texas, by Mary A. Schwalby and her husband against General Stanley and other officers of the Army, to try the title to a parcel of land, part of the military reservation of the United States at San Antonio. The plaintiffs claimed title in one third of the land, and possession of the whole; and Joseph Spence, Jr., intervening, also claimed title in one third. The District Attorney, professing to act in behalf of the United States under instructions from the Attorney General, joined with the defendants in an answer setting up these

defences : 1st. That the action was really against the United States, who were not liable to be sued. 2d. Not guilty. 3d. Title in the United States. 4th. The statutes of limitations of Texas. 5th. Permanent and valuable improvements by the United States.

At the first trial, the inferior court gave judgment for the plaintiffs and the intervenor, against the United States, as well as against the original defendants, for two thirds of the title in the land, and for joint possession with the defendants of the whole, and allowed the United States for their improvements. On appeal from that judgment, the Supreme Court of the State, on March 4, 1892, held that the District Attorney could not submit the rights of the United States to the jurisdiction of the court; that the plaintiffs and the intervenor had made out their title ; that the United States were not innocent purchasers, and had no title to the land ; and that the statutes of limitations, as they did not bind the United States, could not be pleaded by the United States, or by their officers acting under them; and therefore disallowed the claim for improvements, set aside the judgment and dismissed the action as against the United States, and affirmed the judgment against the other defendants. 85 Texas, 348. But this court, at October term, 1892, upon writ of error, held that the United States and their agents were entitled to the benefit of the statutes of limitations; and therefore, without any consideration of the case upon its merits, reversed the judgment, and remanded the case for further proceedings not inconsistent with its opinion. 147 U. S. 508, 519, 520.

The case having been remanded accordingly to the Supreme Court of the State, and by that court to the district court, an amended answer, setting up substantially the same defences as before, was filed by the individual defendants, and by the District Attorney, purporting to act in behalf of the United States under the instructions of the Attorney General. Those instructions (then first filed in the case) appear to have been given by the Attorney General at the request of the Secretary of War, and to have been only " to appear and defend the interests of the United States involved " in this suit. The

district court, upon the same evidence as at the first trial, adjudged that the plaintiffs recover from the individual defendants one undivided third part of the land, and costs, and be put in joint possession with them ; and that the United States be allowed for their improvements.

The case was taken by writ of error to the Court of Civil Appeals, which had been vested, by the statutes of Texas of April 13, 1892, with appellate jurisdiction from the district courts, with a provision for the review of its decisions by the Supreme Court of the State upon petition for a writ of error. Texas Rev. Stat. §§ 1011a–1011c ; Stat. 1892, c. 14, § 1 ; c. 15, § 5 : Gen. Laws, 1st sess. 22d legislature, pp. 19, 20, 26.

The Court of Civil Appeals affirmed the judgment of the district court, except as to the allowance for improvements ; and, "proceeding to render such judgment as should have been rendered by the court below," adjudged that the plaintiffs recover judgment against the individual defendants for one undivided third part of the land, and for costs, and "have their writ of possession against said defendants and all other persons who have entered said premises since the filing of this suit, placing them in joint possession with the defendants," and that the United States pay all the costs in the case. The views of that court are shown by the following extracts from its opinion : "In 1881 or 1882 the United States went into possession of the lot by virtue of the deed [from the city of San Antonio] and were occupying, using and enjoying the same up to the time the suit was instituted on February 23, 1889. The United States had actual notice that the land had been conveyed by Mrs. Dignowity to Duncan B. McMillan, at the time the deed was made to them by the city of San Antonio, and did not make the improvements in good faith. The claim of Joseph Spence was barred by five years' limitation ; but Mrs. Schwalby being under the disability of coverture, the statute did not run as to her." "The United States were not sued, and neither was it attempted to subject the property of the United States to suit; and neither of these propositions was advanced or held by the district court. Stanley and others were sued individually as trespassers, not as

officers of the United States ; and the United States voluntarily made themselves parties to the suit.    That this suit was properly brought has been decided in a number of cases, and has been reaffirmed in this identical case by the Supreme Court of the United States.    The jurisdiction of the court is not ousted because the individuals sued assert authority to hold possession of the property as officers of the United States government.    They must show sufficient authority in law to protect them.    The mere fact that individuals have been placed in possession by the government would not be a valid defence, unless the government had the lawful authority to so place them."   " If McMillan had not paid the purchase money, that did not place appellants in any better position as to notice.    They had actual notice of his claim, and took the risk in making the improvements."    8 Texas Civ. App. 679, 681, 682, 684.

A petition for a writ of error to the Court of Civil Appeals having been presented to the Supreme Court of the State, and denied, the present writ of error from this court was properly addressed to the Court of Civil Appeals, in which the record remained.    Rev. Stat. § 709 ; *Gregory* v. *McVeigh,* 23 Wall. 294 ; *Polleys* v. *Black River Co.,* 113 U. S. 81 ; *Fisher* v. *Perkins,* 122 U. S. 522.

It is contended by the Solicitor General in behalf of the United States that, upon the facts shown by the record, the judgment should be reversed, for several reasons, all of which are worthy of consideration, and may conveniently be considered in the following order :

First.   That the suit is against the United States, and against property of the United States.

Second.   That the claim of the plaintiffs was barred by the statute of limitations.

Third.   That the deed from Dignowity to McMillan, under whom the plaintiffs claim, was never delivered.

Fourth.   That the United States, when they took their deed from the city of San Antonio, had no notice of a previous conveyance to McMillan.

It is a fundamental principle of public law, affirmed by a

long series of decisions of this court, and clearly recognized in its former opinion in this case, that no suit can be maintained against the United States, or against their property, in any court, without express authority of Congress. 147 U. S. 512. See also *Belknap* v. *Schild*, 161 U. S. 10. The United States, by various acts of Congress, have consented to be sued in their own courts in certain classes of cases; but they have never consented to be sued in the courts of a State in any case. Neither the Secretary of War nor the Attorney General, nor any subordinate of either, has been authorized to waive the exemption of the United States from judicial process, or to submit the United States, or their property, to the jurisdiction of the court in a suit brought against their officers. *Case* v. *Terrell*, 11 Wall. 199, 202; *Carr* v. *United States*, 98 U. S. 433, 438; *United States* v. *Lee*, 106 U. S. 196, 205. The original instructions from the Attorney General to the District Attorney, having now been filed and made part of the record, are shown to have been, (as they were at the former stage of this case supposed by the Supreme Court of Texas and by this court to be,) no more than " to appear and defend the interests of the United States involved" in this suit, that is to say, by appearing and taking part in the defence of the officers, and, if deemed advisable, by bringing the rights of the United States more distinctly to the notice of the court by formal suggestion in their name. 85 Texas, 354; 147 U. S. 513. As the present Chief Justice then remarked, repeating the words of Chief Justice Marshall in the leading case of *The Exchange*, 7 Cranch, 116, 147: "There seems to be a necessity for admitting that the fact might be disclosed to the court by the suggestion of the attorney for the United States." The answer actually filed by the District Attorney, if treated as undertaking to make the United States a party defendant in the cause, and liable to have judgment rendered against them, was in excess of the instructions of the Attorney General, and of any power vested by law in him or in the District Attorney, and could not constitute a voluntary submission by the United States to the jurisdiction of the court.

The judgments of the courts of the State of Texas appear to have been largely based on *United States* v. *Lee*, above cited. In that case, an action of ejectment was brought in the Circuit Court of the United States against officers occupying in behalf of the United States lands used for a military station and for a national cemetery. The Attorney General filed a suggestion of these facts, and insisted that the court had no jurisdiction. The plaintiffs produced sufficient evidence of their title and possession; and the United States proved no valid title. This court held that the officers were trespassers, and liable to the action; and therefore affirmed the judgment below, which, as appears by the record of that case, was simply a judgment that the plaintiffs recover against the individual defendants the possession of the lands described, and costs. And this court distinctly recognized that, if the title of the United States were good, it would be a justification of the defendants; that the United States could not be sued directly by original process as a defendant, except by virtue of an express act of Congress; and that the United States would not be bound or concluded by the judgment against their officers. 106 U. S. 199, 206, 222.

In an action of trespass to try title, under the laws of Texas, a judgment for the plaintiff is not restricted to the possession, but may be (as it was in this case) for title also. By section 4784 of the Revised Statutes of the State, " the method of trying title to lands, tenements or other real property shall be by action of trespass to try title." By section 4808, " upon the finding of the jury, or of the court where the case is tried by the court, in favor of the plaintiff for the whole or any part of the premises in controversy, the judgment shall be that the plaintiff recover of the defendant the title, or possession, or both, as the case may be, of such premises, describing them, and where he recovers the possession, that he have his writ of possession." By section 4811, the judgment " shall be conclusive, as to the title or right of possession established in such action, upon the party against whom it is recovered, and upon all persons claiming from, through or under such party, by title arising after the commencement of such action."

And it has been declared by the Supreme Court of the State that, by the statutory action of trespass to try title, "it was unquestionably the legislative intention to provide a simple and effectual remedy for determining every character of conflicting titles and disputed claims to land, irrespective of the fact of its actual occupancy or mere pedal possession;" and "a method of vesting and divesting the title to real estate, in all cases where the right or title, or interest and possession, of land may be involved," by partition or otherwise. *Bridges* v. *Cundiff*, 45 Texas, 440; *Titus* v. *Johnson*, 50 Texas, 224, 238; *Hardy* v. *Beaty*, 84 Texas, 562, 568.

In the case at bar, the United States, and their officers in their behalf, claimed title in the whole land. The plaintiffs claimed title in one undivided third part only. The final decision below was against the claim of the intervenor for another third part of the land. It was thus adjudged that the United States had the title in that part, if not also in the remaining third, to which no adverse claim was made. Such being the state of the case, the final judgment in favor of the plaintiffs for the third part awarded to them, and for possession of the whole jointly with the individual defendants, was directly against the United States and against their property, and not merely against their officers.

The judgment for costs against the United States was clearly erroneous, in any aspect of the case. *United States* v. *Hooe*, 3 Cranch, 73, 91, 92; *United States* v. *Barker*, 2 Wheat. 395; *The Antelope*, 12 Wheat. 546, 550; *United States* v. *Ringgold*, 8 Pet. 150, 163; *United States* v. *Boyd*, 5 How. 29, 51.

But, with a view to the ultimate determination of the case, it is fit to proceed to a consideration of the other questions arising therein.

That the United States and their officers were entitled to avail themselves of the statutes of limitations, was adjudged when this case was first brought before this court. 147 U. S. 508. The Court of Civil Appeals of the State has now held that those statutes did not run against Mrs. Schwalby, because she was under the disability of coverture.

The principal grounds, upon which the Solicitor General

contends that this conclusion was unwarranted by the facts of the case, are as follows: Dignowity, under whom all parties claimed title, had the title and the consequent right of possession of the land, at the time of his supposed deed to McMillan in 1860. The possession is to be presumed to have continued in him, and in those claiming under the subsequent deed of his widow to the city of San Antonio in May, 1875, and the city's deed to the United States in June, 1875. There was no evidence that McMillan, or any one claiming under him, was ever in actual possession of the land. If the title and the right of possession were ever in McMillan, they descended to his daughter Mary and her co-heirs upon his death in 1865. She was then under the disability of infancy, having been born September 11, 1848. On September 11, 1869, she became of age, and the statutes of limitations began to run against her, and could not, by a general rule of law, recognized alike by this court and by the Supreme Court of Texas, be again suspended by the new disability created by her subsequent marriage to Schwalby on January 18, 1871. *McDonald* v. *Hovey*, 110 U. S. 619; *White* v. *Latimer*, 12 Texas, 61. See also *McMasters* v. *Mills*, 30 Texas, 591; *Jackson* v. *Houston*, 84 Texas, 622.

But the statutes of limitations of Texas do not appear to run against a suit to recover real estate, except in favor of one in "adverse possession," which is defined to be "an actual and visible appropriation of land, commenced and continued under a claim of right inconsistent with and hostile to the claim of another." Paschal's Digest, arts. 4621–4624; Rev. Stat. §§ 3191–3199. There was no affirmative evidence showing that such adverse possession of the United States, or of their predecessors in title, the city of San Antonio, and Dignowity, began before 1882, at which time Mrs. Schwalby was under the disability of coverture; or who, if any one, before that time, was in actual possession of the land; although Mrs. Dignowity testified that she paid the taxes upon it from 1860 until she conveyed it to the city in May, 1875. The conclusion that the plaintiffs' claim was not barred may, therefore, have rested upon a possible inference of fact, rather than upon a determination of law.

Upon the question whether the deed from Dignowity to McMillan was ever delivered to the grantee, or to any one in his behalf or claiming under him, the evidence was in substance as follows: The deed was executed May 9, 1860, by Mrs. Dignowity, under a power of attorney from her husband; was acknowledged by her on the same day before William H. Cleveland, who was a notary public, and was a lawyer who had sometimes done business for her husband and herself; and was left by her with Cleveland. The consideration named in the deed was $100, only $50 of which was paid; and that was received by her about the time of executing the deed. She testified that she did not know whether or not she ever formally delivered possession of the land to McMillan or his agent; but that she continued to pay the taxes on the land until she sold and conveyed it to the city of San Antonio in May, 1875. The deed to McMillan was not recorded until September 30, 1889, more than twenty-nine years after its execution. There was no evidence where the deed was during that time, or by whom it was left for record; nor was there any explanation of the delay in recording it. Mrs. Schwalby's attorney testified that he never saw her, and did not know her personally; and that he received the deed by mail from Spence, a lawyer and land agent. Spence was the intervenor in this case, claiming title in one third of the land under a deed from McMillan's son, executed, acknowledged and recorded in March, 1889.

This evidence is far from satisfactory as proof of an actual delivery of the deed. But, considering that the deed to McMillan may possibly have come from him into the hands of his son, and thence into those of Spence, and that some presumption of delivery may arise from the plaintiffs' possession of the deed, we are not prepared to say that the evidence was insufficient, as matter of law, to warrant the conclusion that the deed was in fact delivered. See *Sicard* v. *Davis*, 6 Pet. 124, 137; *Gaines* v. *Stiles*, 14 Pet. 322, 327.

The more serious question is whether there was any evidence that the United States took the deed from the city of San Antonio in June, 1875, with notice of a previous convey-

.ance to McMillan. All the evidence which can be supposed to have any bearing upon this point was as follows:

The deed from Mrs. Dignowity to the city of San Antonio was a quitclaim deed; and the mayor testified that, at the time of the purchase by the city, he had notice from Mrs. Dignowity of McMillan's claim. But the deed from the city to the United States was a deed of warranty, conveying this and other lands to the United States for military purposes; the consideration recited therein was not merely the payment of the nominal sum of one dollar, but "divers and other good and sufficient considerations thereunto moving;" and the conveyance was in fact, as appears by the uncontradicted testimony of the mayor, for the very valuable consideration enuring ᴄto the city from the establishment of the military headquarters there.

The District Attorney, who made the examination of the title for the United States, testified that he examined the records of the county; that he read the quitclaim deed from Dignowity to the city, and had notice of all its contents; that he found no record of any other deed from Dignowity; and that, after making the examination, he believed the title was good, and so advised the department at Washington, and upon his advice the government took the deed from the city in good faith. Upon cross-examination, he testified that he "had information of the sale to McMillan," but satisfied himself that he had never paid the purchase money; and that the facts that the deed from Dignowity to the city was a quitclaim deed, and described the land as "known as the McMillan lot," created no suspicion in his mind that the title was not all right.

By the statutes of Texas, lands cannot be conveyed from one to another, except by instrument in writing; and unrecorded conveyances of lands are void as against subsequent purchasers for valuable consideration without notice; but are valid as between the parties and their heirs, and as to all subsequent purchasers with notice thereof or without valuable consideration. Paschal's Digest, arts. 997, 4988; Rev. Stat. §§ 548, 549, 4332. These provisions have not been regarded

as introducing a new rule; but only as declaratory of the law, as recognized in the chancery jurisprudence of England and of the United States. *Parks* v. *Willard*, 1 Texas, 350.

A purchaser of land for valuable consideration may doubtless be affected by knowledge which an attorney, solicitor or conveyancer, employed by him in the purchase, acquires or has while so employed, because it is the duty of the agent to communicate such knowledge to his principal, and there is a presumption that he will perform that duty. *The Distilled Spirits*, 11 Wall. 356, 367; *Rolland* v. *Hart*, L. R. 6 Ch. 678, 682; *Agra Bank* v. *Barry*, L. R. 7 H. L. 135; *Kauffman* v. *Robey*, 60 Texas, 308. But in order to charge a purchaser with notice of a prior unrecorded conveyance, he or his agent must either have knowledge of the conveyance, or, at least, of such circumstances as would, by the exercise of ordinary diligence and judgment, lead to that knowledge; and vague rumor or suspicion is not a sufficient foundation upon which to charge a purchaser with knowledge of a title in a third person. *Wilson* v. *Wall*, 6 Wall. 83; *Flagg* v. *Mann*, 2 Sumner, 486, 551; *Montefiore* v. *Browne*, 7 H. L. Cas. 241, 262, 269; *Bailey* v. *Barnes*, (1894) 1 Ch. 25; *Wethered* v. *Boon*, 17 Texas, 143. Notice of a sale does not imply knowledge of an outstanding and unrecorded conveyance. *Mills* v. *Smith*, 8 Wall. 27; *Holmes* v. *Stout*, 2 Stockton, (10 N. J. Eq.) 419; *Lamb* v. *Pierce*, 113 Mass. 72.

A valuable consideration may be other than the actual payment of money, and may consist of acts to be done after the conveyance. *Prewit* v. *Wilson*, 103 U. S. 22; *Hitz* v. *Metropolitan Bank*, 111 U. S. 722, 727; 4 Kent Com. 463; Dart on Vendors, (6th ed.) 1018, 1019. The advantage enuring to the city of San Antonio from the establishment of the military headquarters there was clearly a valuable consideration for the deed of the city to the United States.

A purchaser of land, for value, and without notice of a prior deed, holds and can convey an indefeasible title; and therefore the title, either of one who, without notice, purchases from one who purchased with notice, or of a purchaser with notice from a purchaser without notice, is good. *Har-*

*rison* v. *Forth*, before Lord Somers, Pre. Ch. 51; *Boone* v. *Chiles*, 10 Pet. 177, 209; *Flynt* v. *Arnold*, 2 Met. 619, 623; 4 Kent Com. 179. While it is held, in Texas, that a purchaser who takes a quitclaim deed of his grantor's interest only is affected with notice of all defects in the title, yet mere knowledge that the deed is in that form cannot affect the title of one claiming under a subsequent deed of warranty from the grantee. *United States* v. *California Land Co.*, 148 U. S. 31, 46, 47; *Moore* v. *Curry*, 36 Texas, 668; *Graham* v. *Hawkins*, 38 Texas, 628. Still less, could oral notice to the mayor of McMillan's claim, not shown to have been communicated to the United States or their attorney, affect their title under the subsequent deed of warranty from the city.

The attorney's "information of the sale to McMillan," with the purchase money unpaid, was evidently no more than of a bargain between Mrs. Dignowity and McMillan, and not of any deed of conveyance. He searched the records, and found no such deed, and advised the United States that the title was good. The deed from Mrs. Dignowity to McMillan, now produced, had then already remained unrecorded for fifteen years; and there is no evidence in whose custody it was, or that the attorney had any reason to suppose that it existed, or could have learned anything about it from Mrs. Dignowity, or knew, or had the means of ascertaining, where McMillan lived, or whether he was living or dead. The mere description of the land as "known as the McMillan lot" raised no inference that it was still owned, if it ever had been, by any one of that name.

The evidence appears to us wholly insufficient, in fact and in law, to support the conclusion that the attorney had any notice of the previous deed to McMillan, or any knowledge of such circumstances tending to prove the existence of such a deed, that he should have considered or treated them as of any weight, or have reported them to the authorities at Washington. The inevitable conclusion, as matter of law, is that the United States acquired a good and valid title, as innocent purchasers, for valuable consideration, and without notice of a previous conveyance to McMillan.

As was said by this court, when this case was brought here before, " The validity of an authority exercised under the United States is drawn in question; and where the final judgment or decree in the highest court of a State in which a decision could be had is against its validity, jurisdiction exists in this court to review that decision on writ of error." 147 U. S. 519; Rev. Stat. § 709.

The validity of the authority exercised by the defendants as officers of the United States depends, according to the decision in *United States* v. *Lee*, before cited, upon the question whether the United States had or had not a good title in the land.

In *United States* v. *Thompson*, 93 U. S. 586, 588, Chief Justice Waite said : "Judgments in the state courts against the United States cannot be brought here for reëxamination upon a writ of error, except in cases where the same relief would be afforded to private parties." This dictum, in so general a form, is in danger of misleading; and it went beyond anything required by the decision of that case, in which the only issue understood to have been decided in the state courts was one of payment, and no authority under the Constitution, laws or treaties of the United States was set up and decided against. The United States are in the same condition as other litigants, in the sense that neither can invoke the jurisdiction of this court by writ of error to a state court, unless that court has decided against a right claimed under the Constitution, laws or treaties of the United States. But surely the United States have, and may assert, a right, privilege or immunity under the Constitution of the United States, which private parties could not have.

We do not undertake to review the conclusions of the state court as to the effect of Mrs. Schwalby's disability under the statutes of limitations, or as to the delivery of the deed to McMillan, both perhaps depending, as has been seen, upon questions of fact. *Dower* v. *Richards*, 151 U. S. 658; *Israel* v. *Arthur*, 152 U. S. 355; *In re Buchanan*, 158 U. S. 31, 36.

But, so far as the judgment of the state court against the validity of an authority set up by the defendants under the

United States necessarily involves the decision of a question of law, it must be reviewed by this court, whether that question depends upon the Constitution, laws or treaties of the United States, or upon the local law, or upon principles of general jurisprudence. For instance, if a marshal of the United States takes personal property upon attachment on mesne process issued by a court of the United States, and is sued in an action of trespass in a state court by one claiming title in the property, and sets up his authority under the United States, and judgment is rendered against him in the highest court of the State, he may bring the case by writ of error to this court; and, as his justification depends upon the question whether the title to the property was in the defendant in attachment, or in the plaintiff in the action of trespass, this court, upon the writ of error, has the power to decide that question, so far as it is one of law, even if it depends upon local law, or upon general principles. *Buck* v. *Colbath,* 3 Wall. 334; *Etheridge* v. *Sperry,* 139 U. S. 266; *Bock* v. *Perkins,* 139 U. S. 628. And see *McNulta* v. *Lockridge,* 141 U. S. 327, 331; *Dushane* v. *Beall,* 161 U. S. 513.

The decision of the Court of Civil Appeals that the United States had notice of the deed to McMillan, and therefore had no title in the land, and judgment should be rendered against their officers for both title and possession, was a decision in matter of law against the validity of the authority set up by those officers under the United States; and as such was reviewable by this court, and, being erroneous, must be reversed.

The proper form of the judgment to be entered by this court remains to be considered; and in order to ascertain this, it will be convenient to trace the history of the statutes and decisions upon that subject.

Under the Judiciary Act of September 24, 1789, c. 20, § 25, a final judgment or decree in the highest court of a State in which a decision could be had might " be reëxamined and reversed or affirmed" in this court upon a writ of error, "in the same manner and under the same regulations, and the writ shall have the same effect, as if the judgment or decree com-

plained of had been rendered or passed in a Circuit Court; and the proceeding upon the reversal shall also be the same, except that the Supreme Court, instead of remanding the cause for a final decision as before provided, may, at their discretion, if the cause shall have been once remanded before, proceed to a final decision of the same, and award execution." 1 Stat. 86.

The qualification, "if the cause shall have been once remanded before," restricted only the power to proceed to a final decision and award execution in this court, and did not restrict the power of this court to reverse or affirm the judgment of the state court, as justice might require. Accordingly, in the leading case upon the subject of the appellate jurisdiction of this court from the courts of a State, this court, upon the first writ of error to the Court of Appeals of Virginia, not only reversed the judgment of that court, but affirmed the judgment of the inferior court of the State, which had been reversed by the Court of Appeals, and issued its mandate to the Court of Appeals accordingly; and, upon that court declining to obey the mandate, this court, upon a second writ of error, rendered judgment in the same terms as before. *Fairfax* v. *Hunter*, 7 Cranch, 603, 628; *Martin* v. *Hunter*, 1 Wheat. 304, 323, 362.

The act of February 15, 1867, c. 28, § 2, revising the subject, omitted the qualification "if the cause shall have been once remanded before," and put the last clause of the section in this form: "and the proceeding upon the reversal shall also be the same, except that the Supreme Court may, at their discretion, proceed to a final decision of the case, and award execution, or remand the same to an inferior court." 14 Stat. 386. The sections of the acts of 1789 and 1867 are printed side by side in 17 Wall. 681, 682.

In *Maguire* v. *Tyler*, this court, at December term, 1869, adjudged that a decree in equity of the Supreme Court of Missouri be reversed, and the case remanded with directions to enter a decree affirming the decree of an inferior court of the State; but, upon motion of counsel, modified its judgment so as to remand the cause for further proceedings in conformity to the opinion of this court, and declared this to " be more

in accordance with the usual practice of the court in such cases." 8 Wall. 650, 658, 662. The Supreme Court of Missouri, after receiving the mandate of this court, entered a decree dismissing the suit because there was an adequate remedy at law; and thereupon this court, at December term, 1872, upon a second writ of error, entered judgment here, reversing that decree, with costs, and ordering a writ of possession to issue from this court; and, speaking by Mr. Justice Clifford, after referring to the difference between the provisions of the acts of 1789 and 1867, said: "Much discussion of those provisions is unnecessary, as it is clear that the court, under either, possesses the power to remand the cause or to proceed to a final decision. Judging from the proceedings of the state court under the former mandate, and the reasons assigned by the court for their judicial action in the case, it seems to be quite clear that it would be useless to remand the cause a second time, as the court has virtually decided that they cannot, in their view of the law, carry into effect the directions of this court as given in the mandate. Such being the fact, the duty of this court is plain, and not without an established precedent." 17 Wall. 253, 289, 290, 293. The precedent referred to was *Martin* v. *Hunter*, above cited.

Section 2 of the act of 1867 was substantially reënacted in Rev. Stat. § 709. By the act of February 18, 1875, c. 80, entitled "An act to correct errors and to supply omissions in the Revised Statutes of the United States," section 709 of the Revised Statutes was amended by striking out this provision: "and the proceeding upon the reversal shall be the same, except that the Supreme Court may, at their discretion, proceed to a final decision of the case, and award execution, or remand the same to the court from which it was so removed." 18 Stat. 318; Rev. Stat. (2d ed.) p. 133.

The repeal of this provision may not have revived that provision of the act of 1789 which had been superseded by the act of 1867. Rev. Stat. § 12. But it did not affect the general power, conferred by section 709 of the Revised Statutes, as by all former acts, by which the judgment of the state court may be "reëxamined and reversed or affirmed" by this

court, and in the exercise of which this court, in *Fairfax* v. *Hunter*, and *Martin* v. *Hunter*, above cited, ordered the proper judgment to be entered in the state court. .

Under the statutes and practice of the State of Texas, the appellate court, upon a statement of the case certified by the judge, may, as the Supreme Court and Court of Civil Appeals did in this case, and as this court does upon a finding of facts by the Circuit Court of the United States in cases tried by the court upon a jury being duly waived, render such judgment as should have been rendered by the court below. Texas Rev. Stat. § 1048; Stat. April 13, 1892, c. 14, § 1; c. 15, § 36; *McIntosh* v. *Greenwood*, 15 Texas, 116; *Creager* v. *Douglass*, 77 Texas, 484; *Fort Scott* v. *Hickman*, 112 U. S. 150, 165; *Cleveland Rolling Mill* v. *Rhodes*, 121 U. S. 255, 264.

In the present case, the previous course of the proceedings has been such as to make it proper that the usual practice, by which, upon reversing a judgment of the highest court of a State, the case is remanded generally for further proceedings not inconsistent with the opinion of this court, should be departed from; and that this court should instruct the state court to enter a judgment finally disposing of the case.

The Supreme Court of Texas, after the first trial, held that the United States were not a party to the action, and dismissed it as to the United States; but held that the United States were not innocent purchasers for value, and denied to the United States and their officers the benefit of the statutes of limitations, and therefore gave judgment for the plaintiffs against those officers. This court, upon the first writ of error, reversed that judgment, and, assuming the statutes of limitations to afford a conclusive defence, refrained from considering the case upon its merits, and remanded it for further proceedings in the courts of the State. The case was then submitted to the inferior court of the State of Texas, and to the Court of Civil Appeals, upon the same facts as before; and the Court of Civil Appeals, held that the United States were a party to the action, thereby in effect overruling the former judgment of the Supreme Court of the State; and decided, upon evidence wholly insufficient in law, that the

United States had no valid title to the land, because they took with notice of a prior conveyance to McMillan; and gave judgment for the plaintiffs against the individual defendants, acting under lawful authority of the United States, for the title in an undivided third part of the land demanded, and for joint possession of the whole; and also gave judgment against the United States for costs, to which the United States are never liable. The Supreme Court of the State denied a petition for a writ of error to review that judgment; the Chief Justice of the Court of Civil Appeals refused to allow a writ of error from this court to review it; and the allowance of the present writ of error was obtained from a justice of this court.

>*Judgment of the Court of Civil Appeals reversed, and case remanded to that court with instructions to dismiss the action as against the United States, and to enter judgment for the individual defendants, with costs.*